IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) Criminal No. | 1:15-CR-124 (GLS) |
| | ) | |
| v. | ) **Information** | |
| | ) | |
| **SCOTT VALENTE,** | ) Violations: | 15 U.S.C. § 78j(b) [Securities Fraud]; 18 U.S.C. § 1341 [Mail Fraud]; 26 U.S.C. § 7212(a) [Obstructing & Impeding the IRS] |
| | ) | |
| | ) Three Counts | |
| **Defendant.** | ) Counties of Offenses: | Albany and Schenectady |

## THE UNITED STATES ATTORNEY CHARGES:

## INTRODUCTORY ALLEGATIONS

At all times material to this Information,

## BACKGROUND ON THE ELIV GROUP, LLC

1. In or about November 2010, **SCOTT VALENTE** established a New York State limited liability company called "The ELIV Group, LLC" [hereinafter "ELIV"].

2. ELIV actively operated as an investment business from in or about December 2010, until on or about June 16, 2014 when ELIV was enjoined from operating and had its assets frozen pursuant to a preliminary injunction and asset freeze order issued by the United States District Court for the Southern District of New York (Case No. 14 Civ. 3974 (VLB) (JCM)).

3. During ELIV's operational period, ELIV had its principal place of business in Albany, New York and also maintained an office in Warwick, New York. For a period of time **VALENTE** also conducted ELIV business out of his Schenectady, New York residence. ELIV

has never been registered in any capacity with the Securities and Exchange Commission (SEC), Financial Industry Regulatory Authority (FINRA), or any other self-regulatory organization.

4. **VALENTE** served as ELIV's *de facto* owner, manager and, apart from clerical assistance, was ELIV's sole employee.

## THE ELIV GROUP INVESTMENT FUND

5. **VALENTE**, through ELIV, sought investment advisory clients to invest in an investment fund called "The ELIV Group Investment Fund" a/k/a "The ELIV Group, LLC Fund" [hereinafter "the Fund"], a security under Section 3(a)(1) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(1)). **VALENTE** solicited clients through a variety of mediums including ELIV's website (www.elivgroup.com), public informational seminars, and word-of-mouth referrals.

6. The Fund operated in a somewhat similar fashion to a mutual fund in that investments of each individual ELIV investor were pooled, and the Fund then made investments in various stocks, options and currencies.

7. Each ELIV investor entered into a contractual advisory relationship with ELIV wherein the investors agreed to a 1.0% "annual management fee" to be paid to ELIV for its efforts in making and managing the various investments held by the Fund.

8. During ELIV's operational period, over 100 individual investors collectively invested over $10.5 million in principal with ELIV / the Fund.

9. Once a prospective ELIV investor decided to invest with ELIV, the investor typically purchased the investment by delivering to **VALENTE** either a check payable to one of ELIV's bank/trade accounts, or a check payable to **VALENTE**'s wife or her account held at First New

York Federal Credit Union. In turn, **VALENTE** would ultimately transfer the new investor's deposit into one of ELIV's bank accounts.

10. Once the new ELIV investor's check cleared, the new investor typically received, via the U.S. Mail, some type of written correspondence (often labelled as an "Investment Contract") from ELIV documenting, among other things, that the investor's investment had been made on a particular date, and that there would be a 1.0% "annual management fee." The "Investment Contract" also advised new ELIV investors that ELIV's goal was "to produce a monthly return of 3-6% per month." The "Investment Contract" typically warned the new investor that while ELIV could not promise future monthly returns of 3-6%, ELIV had returned particularized annual positive return percentages in the two prior calendar years.

## MISREPRESENTATIONS MADE TO PROSPECTIVE INVESTORS CONCERNING ELIV'S PRIOR INVESTMENT PERFORMANCE

11. **VALENTE** made misrepresentations to prospective investors to persuade them to invest. For example, he made false statements about the Fund's annual returns in both investment contracts and on ELIV's website to induce prospective investors to invest with ELIV, and to encourage new and current investors to remain as investors with ELIV.

12. In the 2012 investment contracts, **VALENTE** falsely stated that the total return for the Fund "for 2010 and 2011 was 36.383% and 48.27% respectively," and in the 2014 investment contracts, he falsely stated that the "total returns for [the Fund] 2012 and 2013 were 44.56% and 45.11% respectively." In the Spring of 2014 **VALENTE** falsely claimed, on ELIV's website, that ELIV "has returned a five year average annual return of 34.5%." In reality, as **VALENTE** then well knew, ELIV/the Fund's annual performance in each of calendar years 2010, 2011, 2012 and 2013 was negative. From ELIV's inception through April 30, 2014, ELIV/the Fund sustained overall trading losses in excess of $1.2 million.

3

## MISREPRESENTATIONS MADE TO EXISTING INVESTORS CONCERNING ELIV'S ONGOING INVESTMENT PERFORMANCE

13. Existing ELIV investors typically received, via the U.S. Mail, monthly written correspondence from **VALENTE** entitled "The ELIV Group, LLC Fund Investment Report" a/k/a "The ELIV Group, LLC Investment Report" [hereinafter "monthly reports"] that reported how ELIV/the Fund performed in the previous calendar month. These monthly reports purported to detail "the monthly net return" for the Fund, and purported to detail the return on the individual ELIV investor's investment. Typically, the individual ELIV investor's monthly return matched the Fund's monthly return.

14. As an example of the written representations that **VALENTE** made to existing ELIV investors in the monthly reports, **VALENTE** stated that for the period running April 1, 2013 through April 30, 2013, ELIV/the Fund "produced a monthly net return of 3.27%." Similarly, **VALENTE** advised investors in each's monthly report for the April 2013 time period that each investor's investment had a gain of 3.27%.

15. The purported positive monthly returns claimed by **VALENTE** in the monthly reports issued to existing ELIV investors were almost always false. In actuality, ELIV/the Fund, for the months December 2010 through April 2013, a span of 41 months, lost money for 31 out of 41 months. In April 2013 alone, ELIV/the Fund incurred over $134,000 in losses which made it impossible for an ELIV investor to have a gain of 3.27% for the time period April 1, 2013 through April 30, 2013. **VALENTE** made up the falsely inflated monthly returns to encourage existing ELIV investors to remain invested in ELIV/the Fund, and to induce existing ELIV investors to make additional investments into ELIV/the Fund.

16. At the time that ELIV ceased operations (stopped buying and selling securities, and stopped soliciting new investors) pursuant to the court-ordered preliminary injunction and asset

4

freeze, approximately $2.4 million of the eight-plus million dollars of investor principal **VALENTE** received from investors during ELIV's operational period had been returned to investors with the false representations that these payments were a return of principal or a distribution of profits. Additionally, as of June 2014, ELIV/the Fund held approximately $3.8 million worth of investments, almost $6 million less than investors had provided as principal.

### MISREPRESENTATIONS ABOUT ELIV'S ABILITY TO HOLD "IRA" ACCOUNTS

17. While soliciting prospective investors, **VALENTE** claimed that he/ELIV could open Individual Retirement Accounts ("IRAs") and accept IRA roll-over investments from other financial institutions. In actuality, **VALENTE**/ELIV was not, and has never been, qualified or authorized to establish or maintain custody of IRAs under the Internal Revenue Service's (IRS) rules and regulations that govern the acceptance, holding and management of IRA accounts.

18. Based upon **VALENTE**'s representations that he/ELIV was authorized to accept, hold and manage IRA accounts, approximately 30 of ELIV's investors took distributions from their existing non-ELIV IRA accounts and rolled, within spans of 60 days, these distributions into purported IRA accounts with ELIV/the Fund. These ELIV IRA investors believed that their retirement investments were being carried by ELIV as IRA accounts because their ELIV "Investment Contracts" and ELIV monthly reports stated the account type as "IRA" (as compared to "Individual").

19. In addition to preparing and issuing "Investment Contracts" and monthly reports that deceived ELIV investors into believing that their retirement investments were being carried by ELIV as IRA accounts, **VALENTE** also altered, and subsequently issued to some ELIV investors and their tax preparers/certified public accountants, financial account statements in order to make it appear that ELIV was holding the investors' retirement accounts as legitimate

IRA accounts. Some of the altered financial account statements were ultimately sent to the Internal Revenue Service.

## COUNT 1
## [Securities Fraud]

20. The allegations in paragraphs 1 – 19 are incorporated into Count One of this Information.

21. On or about April 1, 2014, in the Southern District of New York, and elsewhere, the defendant, **SCOTT VALENTE**, willfully and knowingly, directly and indirectly, by the use of the mails, in connection with the purchase and sale of any securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by making untrue statements of material fact within the following transaction: on or about April 1, 2014, **VALENTE** mailed and caused to be mailed, an "Investment Contract" to ELIV investor C.K. that falsely claimed that ELIV/the Fund's "total returns for 2012 and 2013 were 44.56% and 45.11% respectively," when as **VALENTE** then well knew, these total returns were false because ELIV/the Fund lost money in both 2012 and 2013, in violation of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT 2
## [Mail Fraud]

22. The allegations in paragraphs 1 – 19 are incorporated into Count Two of this Information.

23. From in or about December 2010 through in or about June 2014, in the Northern District of New York, and elsewhere, the defendant, **SCOTT VALENTE**, devised and intended to devise a scheme and artifice to defraud investors by soliciting investments under false pretenses, and to obtain money and property by means of material false and fraudulent pretenses and representations and attempting to do so.

24. For the purpose of executing such scheme to obtain money and property by means of material false and fraudulent pretenses and representations, defendant **SCOTT VALENTE**, in the Northern District of New York and elsewhere, on or about May 1, 2013, knowingly placed, and caused to be placed, in a post office and authorized depository for mail, a document to be sent and delivered by the United States Postal Service and by any private or commercial interstate carrier, that is **VALENTE** mailed "The ELIV Group, LLC Fund Investment Report [for the] Period beginning April 01, 2013 thru April 30, 2013" to M.M in Kingston, New York, in violation of Title 18, United States Code, Section 1341.

## COUNT 3
### [Obstructing and Impeding the Internal Revenue Laws]

25. The allegations in paragraphs 1 – 19 are incorporated into Count Three of this Information.

26. From in or about October 2011 through in or about May 2013, in the Northern District of New York, and elsewhere, the defendant, **SCOTT VALENTE**, did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws by preparing an altered document that purported to show that ELIV was holding ELIV investor M.F.'s $154,800.00 investment as an Individual Retirement Account (IRA), and issuing that altered document to M.F. and M.F.'s Certified Public Accountant (CPA), when as **VALENTE** then well knew, neither he nor ELIV was authorized under IRS rules and regulations to establish or maintain IRA accounts, and that the altered document would be transmitted to the Internal Revenue Service in connection with M.F.'s 2011 income tax return, in violation of Title 26, United States Code, Section 7212(a).

## FORFEITURE ALLEGATION RELATING TO COUNT TWO
## [18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461]

27. The allegations contained in Count Two of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

28. Upon conviction of the offense in violation of Title 18, United States Code, Section 1341 set forth in Count Two of this Information, the defendant, **SCOTT VALENTE**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following:

   a. a Money Judgment for the amount of $10,555,954.27;

   b. the real property commonly referred to as River Oaks Golf and Tennis Resort II, Unit 46F, 650 River Oaks Drive, Myrtle Beach, South Carolina; and

   c. the real property commonly referred to as Jackson Gore Road Adams House, Ludlow, Vermont. Parcel Identification Number 363-112-13607.

The net proceeds from the sale of any and all real property forfeited shall be credited towards the balance of the money judgment.

29. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

Dated:   May 11, 2015

                    RICHARD S. HARTUNIAN
                    United States Attorney

By: _____
       Richard Belliss
       Assistant United States Attorney
       Bar Roll No. 515295