IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:15-CR-124 (GLS) |
| | ) | |
| **v.** | ) | **Plea Agreement** |
| | ) | |
| **SCOTT VALENTE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **SCOTT VALENTE** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1)    **<u>The Defendant's Obligations</u>**:

    a)  **Guilty Plea:** The defendant will waive indictment, and plead guilty to Counts One, Two and Three of the information in Case No. 1:15-CR-124 (GLS) charging him with (i) Securities Fraud (Count One), in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; (ii) Mail Fraud (Count Two), in violation of 18 U.S.C. § 1341; and (iii) Obstructing and Impeding the Due Administration of the Internal Revenue Laws (Count Three), in violation of 26 U.S.C. § 7212(a).

    b)  **Waiver of Venue:** The defendant specifically agrees for purposes of this plea to waive any right to contest venue in the United States District Court for the Northern District of New York.

    c)  **Special Assessment:** The defendant will pay an assessment of $100.00 per count of conviction pursuant to 18 U.S.C. § 3013. The defendant agrees to deliver a check or

money order to the Clerk of the Court in the amount of $300.00, payable to the U.S. District Court, at the time of sentencing.

d) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

e) **Restitution:** The defendant will consent to entry of an order directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of the offenses of conviction under 18 U.S.C. § 3663 or § 3663A and the following offenses, whether or not encompassed in the offenses of conviction: wire, mail, and securities fraud charges resulting in any losses to any ELIV Group LLC investors regardless of whether they are named in the information. The defendant, who is presently subject to a June 16, 2014 Order freezing The ELIV Group, LLC's assets and providing for other relief, as modified by the Order entered September 25, 2014, in *SEC v. Valente, et al.*, 14 Civ. 3974 (VLB) (JCM) (S.D.N.Y.), (the "Asset Freeze Order"),will take all reasonable and lawful steps he can to liquidate the assets of The ELIV Group, LLC and to transfer the resulting monies to the Clerk of Court for the Northern District of New York to be used towards payment of any court-ordered restitution obligation of the defendant but only after first obtaining appropriate modification of the Asset Freeze Order.

f) **Forfeiture:** Pursuant to 18 U.S.C. §§ 981(a)(1)(C) & 28 U.S.C. § 2461 (Count Two), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the information described above, or to any substitute assets, or to a money judgment, all as more fully set out below:

2

(1) Regarding Count Two, a money judgment for the amount of $10,555,954.27;

(2) The real property commonly referred to as River Oaks Golf and Tennis Resort II, Unit 46F, 650 River Oaks Drive, Myrtle Beach, South Carolina; and

(3) The real property commonly referred to as Jackson Gore Road Adams House, Ludlow, Vermont.  Parcel Identification Number: 363-112-13607.

The net proceeds from the sale of any and all property forfeited shall be credited towards the balance of the money judgment.

g) **Access to Records:** The defendant will provide any privacy waivers, consents, or releases requested by the United States Attorney's Office to access records to verify the defendant's financial disclosures.  The defendant authorizes the United States Attorney's Office to inspect and copy all financial documents and information provided by the defendant to the U.S. Probation Office.

h) **No Transfer of Assets:** The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this plea agreement and/or that may be imposed by the Court.  In addition, the defendant promises not to make any such transfers in the future.

i) **Tax Offenses/Disclosure to IRS:** The defendant agrees to provide timely, full, complete, and accurate information to the Internal Revenue Service for the calendar years 2010 through 2014 and fully cooperate in the determination and payment of any income or withholding taxes, penalties, and interest that may be due and owing to the United States for those years by the defendant and the defendant's spouse.  The defendant agrees that, within 90 days of the entry of the guilty plea, the defendant

will file legal and accurate amended income tax returns for calendar years 2010 through 2014 for the defendant and the defendant's spouse.

2)    **The Government's Obligations**:

     a)  **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the information in Case No 1:15-CR-124 (GLS) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement.  This agreement does not prevent the government from seeking charges based on other conduct.

     b)  **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

3)    **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offenses to which the defendant agrees to plead guilty and may be required to impose mandatory minimum terms of imprisonment, all as set out below:

     **Count One (Securities Fraud)**

  a)  **Maximum term of imprisonment:** 20 years, pursuant to 15 U.S.C. § 78ff.

  b)  **Maximum fine:** $5,000,000, pursuant to 15 U.S.C. § 78ff.

     **Count Two (Mail Fraud)**

  c)  **Maximum term of imprisonment:** 20 years, pursuant to 18 U.S.C. § 1341.

  d) **Maximum fine:** $250,000, pursuant to 18 U.S.C. § 3571(b)(3).

### **Count Three (Obstructing and Impeding the Internal Revenue Service)**

e) **Maximum term of imprisonment**: 3 years, pursuant to 26 U.S.C. § 7212(a).

f) **Maximum fine**: $5,000, pursuant to 26 U.S.C. 7212(a).

### **All Counts**

g) **Supervised release term:** In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to three years, to begin after imprisonment. *See* 18 U.S.C. § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to two years.

h) **Other adverse consequences:** Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4) <u>**Elements of Offenses:**</u> The defendant understands that the following are the elements of the offenses to which the defendant agrees to plead guilty. The defendant admits that the defendant's conduct satisfies each and every one of these elements, all as set out below:

Count One (Securities Fraud)

a) First, that in connection with the purchase and sale of any security, the defendant made an untrue statement of material fact;

b) Second, that the defendant acted willfully, knowingly, and with the intent to defraud; and

c) Third, that the defendant knowingly used, or caused to be used, the mails in furtherance of the fraudulent conduct.

Count Two (Mail Fraud)

d) First, that a scheme to defraud existed, the defendant had a conscious, knowing intent to defraud, and the materiality of a misrepresentation or omission,

e) Second, money or property as the object of the scheme, and

f) Third, use of the mails to further the scheme.

Count Three (Corruptly Obstructing and Impeding the Internal Revenue Service)

g) First, that the defendant corruptly;

h) Second, endeavored to; and

i) Third, obstruct or impede the due administration of the Internal Revenue Laws.

5) **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offenses to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to those offenses:

a) The ELIV Group, LLC (ELIV) was a limited liability company registered by VALENTE in November 2010. ELIV's main office was in Albany, New York, and it also had an office in Warwick, New York. VALENTE also used his Schenectady, New York home to conduct ELIV business. ELIV has never been registered with the Securities and Exchange Commission, Financial Industry Regulation Authority (FINRA), or any other self-regulatory organization. In April 2009, VALENTE was barred from having any association with FINRA members.

b) From December 2010 through June 16, 2014, VALENTE, through ELIV,[1] obtained more than $10.5 million from more than 100 investors. VALENTE operated ELIV until June 16, 2014 when the United States District Court for the Southern District of

---

[1] ELIV collected an annual management fee for VALENTE's advice about which securities ELIV should invest.

New York issued a preliminary injunction enjoining ELIV from operating and freezing its assets. Throughout ELIV's operational period, VALENTE was ELIV's *de facto* owner, manager and, apart from clerical staff, its only employee.

c) Specifically, VALENTE used ELIV to obtain money from people to be invested in "The ELIV Group Investment Fund" a/k/a "The ELIV Group, LLC Fund" ("the Fund"). The Fund is a security under Section 3(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(1)). According to VALENTE, all investor investments would be pooled in the Fund and then be used to purchase stocks, options, and currency.

d) After a new investor's deposit cleared, VALENTE normally mailed the investor an investment contract stating that although future returns could not be guaranteed, the Fund had achieved specific annual returns during the prior two years. For example, the 2012 investment contracts stated that the total return for the Fund "for 2010 and 2011 was 36.383% and 48.27% respectively." The 2014 investment contracts stated that the "total returns for [the Fund] 2012 and 2013 were 44.56% and 45.11% respectively." VALENTE also touted the Fund's long term success on ELIV's website which stated, in the spring of 2014, that the Fund "has returned a five year average annual return of 34.5%." These statements were false because the Fund had lost money every year of its existence and had lost more than $1.2 million total by April 30, 2014. VALENTE made up these falsely inflated annual return figures to encourage investments and discourage withdrawals. Investors relied on these false representations when deciding whether and how much money to invest in the Fund.

e) For example, on March 1, 2014, C.K. invested $50,000 into the Fund.  On April 1, 2014, VALENTE, from a location in Warwick, New York, used, and caused the use of, the U.S. Mail to mail C.K. an investment contract that falsely claimed that the Fund's "total returns for 2012 and 2013 were 44.56% and 45.11% respectively."  This false statement was material to C.K.'s decision to invest with ELIV and to remain with ELIV as an investor.

f) VALENTE also mailed investors monthly reports about the Fund's performance entitled "The ELIV Group, LLC Fund Investment Report" a/k/a "The ELIV Group, LLC Investment Report" (hereinafter "monthly reports").  These monthly reports supposedly detailed "the monthly net return" for the Fund, and the return on each investor's investment which normally matched the Fund's monthly return.  Like the annual return rates in the investment contracts, the monthly reports contained false statements.  Although the Fund lost money for 31 out of 41 months from December 2010 through April 2014, VALENTE falsely reported positive returns to cause investors not to withdraw their investments and to make new investments in the Fund.

g) For example, in early May 2013, VALENTE mailed monthly reports to investors stating that in April 2013 the Fund "produced a monthly net return of 3.27%" and that investors had the same return on their investments when he knew that the Fund had actually lost over $134,000 that month.  Investors relied on these false representations when deciding whether to remain invested in the Fund.

h) As another example, on December 17, 2012, investor M.M. invested $45,000 into the Fund.  On May 1, 2013, VALENTE used the U.S. Mail to send M.M. (who lived and received mail in Kingston, New York) "The ELIV Group, LLC Fund Investment

Report [for the] Period beginning April 01, 2013 thru April 30, 2013" that falsely claimed that the Fund "produced a monthly net return of 3.27%" for April 2013 when in reality the Fund lost over $134,000.

i) VALENTE also made false representations to investors about his ability to accept and manage Individual Retirement Accounts ("IRAs") so that he could charge a 1.0% annual management fee on any IRA investments.   Internal Revenue Service rules and regulations govern the acceptance, holding and management of IRA accounts and allow the rollover of IRA accounts from one authorized financial institution to another without incurring any taxes under specific circumstances.   Neither VALENTE nor his businesses was authorized to accept, establish, or maintain IRA accounts as required, but VALENTE nevertheless told investors that he/ELIV/the Fund could accept, hold, and manage their IRA accounts.   Based on those false representations, approximately 30 investors transferred money from IRA accounts at authorized financial institutions to what they believed were IRA accounts at the Fund/ELIV.  VALENTE also sent them "Investment Contracts" and monthly reports stating that these funds were "IRA" accounts.   Based on these false representations, investors believed that they had completed valid "rollovers" and did not report the transfers as taxable distributions to the IRS.   The IRS learned about the transfers and, because neither ELIV nor the Fund were authorized to accept, establish, or maintain IRA accounts, took the position that the investors had taken distributions and owed taxes on those distributions.  VALENTE then tried to conceal what he had done by offering to communicate with the IRS for investors and by preparing and issuing altered documents that purported to show he/ELIV were lawfully holding investors'

IRA accounts. In addition, when accountants for ELIV IRA investors asked questions, VALENTE told those accountants that he would communicate with the IRS and began preparing tax returns for those clients to conceal what he had done.

j)  For example, in the Fall of 2011, ELIV investor M.F. (who lived in Schenectady, New York) took a $154,800.00 distribution from an IRA account at a non-ELIV authorized financial institution and transferred this amount into a purported ELIV IRA account.  This transfer was done within sixty days of the distribution and M.F. believed that he/she had rolled over his/her IRA into the ELIV IRA account without triggering any tax consequences.

k)  On or about May 6, 2013, the IRS issued a notice to M.F. advising that the 2011 distribution he/she took from his/her IRA appeared to be taxable.  M.F. immediately contacted his/her Certified Professional Accountant (CPA) (based in Albany, New York), who had prepared M.F.'s 2011 income tax return, and asked for assistance. The CPA quickly contacted VALENTE and asked VALENTE if he/ELIV would be generating an IRS Form 5498 that would show that M.F. had successfully and timely rolled over his/her $154,800 IRA account into an ELIV IRA account.

l)  VALENTE knew that he could not legitimately issue an IRS Form 5498 because neither he nor ELIV was authorized to accept, establish or maintain IRA accounts. Instead, in or about mid-May 2013, VALENTE used a legitimate quarterly investment statement issued by tradeMONSTER for a general account held by The ELIV Group, LLC, and altered the statement to make it appear as though ELIV had, in 2011, received M.F.'s IRA rollover investment, that ELIV was holding the investment as an IRA, and that there should be no taxable distribution.  Also in mid-

10

May 2013, VALENTE sent the altered tradeMONSTER statement to M.F.'s CPA knowing that the CPA would provide the statement to the IRS in an effort to show the IRS that no tax was due and owing from M.F.'s 2011 rollover of his/her $154,800 IRA investment.

m) On May 16, 2013, M.F.'s CPA wrote a letter to the IRS, arguing that M.F. owed no taxes to the IRS as pertained to M.F.'s 2011 purported rollover of $154,800 into the ELIV IRA and provided the altered tradeMONSTER statement in support of that argument. The IRS received that altered statement and was deceived into believing that M.F.'s $154,800 IRA investment had been rolled over into an ELIV IRA account. On July 29, 2013, the IRS sent M.F. a notice advising that he/she owed no taxes in connection with M.F.'s 2011 rollover of his/her $154,800 IRA account into the ELIV IRA account.

n) At the time that ELIV ceased operations pursuant to the court-ordered preliminary injunction and asset freeze, approximately $2.4 million of the more than $10 million dollars of investor principal that VALENTE had received from investors during ELIV's operational period had been returned to investors with the false representations that these payments were a return of principal or a distribution of profits. VALENTE knew that the very small profits earned were far less than those payments.

o) In addition, despite the frequent and substantial trading losses, VALENTE, as of June 2014, improperly enriched himself by taking more than $2.2 million in unauthorized "annual management fee[s]" from ELIV investors. VALENTE spent the unauthorized fees on a variety of goods and services that benefitted he and his wife,

to include approximately $230,000 in cash withdrawals, $443,000 on credit cards, $117,000 on a condominium in Vermont, $35,000 on jewelry, $424,000 on house-related improvements and maintenance for his Schenectady home, $29,000 on mortgage payments for his Schenectady home, and $20,000 on liquor.

p) The actual loss amount to investors due to VALENTE's criminal conduct is at least $2.2 million.

6)   **Sentencing Stipulations:** The following sentencing stipulations are agreed to by the parties:

a) The parties agree that for purposes of Count One and Count Two, the total loss to ELIV victims/investors is at least $2.2 million in accordance with U.S.S.G. § 2B1.1(b)(1)(I). It is the government's position that the loss amount is more than $2.2 million, and the government will advocate for a higher loss amount. The defendant disagrees and will argue that it is no more than $2.2 million.

b) It is the government's position that for purposes of Count One and Count Two, the defendant's criminal conduct involved more than 50 victims/investors resulting in a four level increase under U.S.S.G. § 2B1.1(b)(2)(B). The defendant does not agree.

c) The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense(s) to which the defendant is pleading guilty; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or

12

engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. §3C1.1.

d) The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. §3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 before receipt of any acceptance of responsibility adjustment under U.S.S.G. §3E1.1(a).

7) **Waiver of Rights to Appeal and Collateral Attack:** The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

a) The convictions resulting from the defendant's guilty plea;

b) Any sentence to a term of imprisonment of 210 months or less;

c)  Any sentence to a fine within the maximum permitted by law;

d) Any sentence to a term of supervised release within the maximum permitted by law;

e) Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

---

A. **Right to Counsel:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right.   Defense counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties.  If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement.  Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E. **Sentencing:**

    a. **Maximum terms of imprisonment:**  The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement.  If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other.  Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively.  *See* 18 U.S.C. § 3584.

b. **Mandatory minimum terms of imprisonment:** If specified in this agreement, the conviction on one or more charges to which the defendant has agreed to plead guilty may require imposition of a mandatory minimum term of imprisonment. In such cases, the court must impose a term of imprisonment no less than the required mandatory minimum term unless an exception to that requirement applies. Such exception may be dependent on a motion by the government.

c. **Section 851 Enhancements:** The defendant understands that if the government has filed an information against the defendant as provided 21 U.S.C. § 851, alleging that the defendant has one or more final convictions for a felony drug offense, and, as part of this agreement, the defendant has admitted and/or affirmed that he was so convicted, then, by pleading guilty, the defendant will lose the right to attack any sentence the court imposes by challenging any such prior conviction.

d. **Sentencing guidelines:**

   i. The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

16

ii. Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court. Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

iii. Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. If the presentence investigation reveals that the defendant's criminal history may support an offense level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

e. **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

f. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence.  In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding.  For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution.  If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement.  To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

g. **Government's Discretion to Recommend a Sentence:**  Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable

guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

h. **Sentencing-Related Information:**  The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8.  No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence.  The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report.  The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

i. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

j.  Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

k.  If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, may bar readmission to the United States if the defendant leaves the country, and may result in a denial of a pending or future application for citizenship.  Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud.   Removal and other immigration consequences are the subject of a separate proceeding. No one, including the defendant's attorney and the Court, can predict with certainty the effect of the conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States.

l.  A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G. **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664. In any case involving a conviction for a sexual exploitation offense in chapter 110 of title 18 of the United States Code, the Court must order restitution for the full amount of the victim's losses as determined by the court. The victim's losses include, but are not limited to medical services related to physical, psychiatric, or psychological care; physical or occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees and other costs; and any other losses suffered by the victim as a proximate result of the offense. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

m. The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including

21

substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

n.  The defendant consents to the entry of an order of forfeiture of the assets described above.

o.  The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents.  The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court.  The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

p.  Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture.  Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

q.  In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party.  The defendant agrees that

forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

r.  The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

s.  The defendant waives the right to a jury trial on the forfeiture of assets.  The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

t.  The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

u.  The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

v.  The defendant acknowledges joint and several liability for the amount of any money judgment set forth above.

w.  In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property.  The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

**I.  Determination of Financial Condition and Payment of Interest and Penalties:**

x.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

y.  The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

z.  The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

aa. Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

24

**J. <u>Remedies for Breach:</u>**

bb. Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

cc. If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

    i. To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement,

notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

ii. In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

iii. To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

iv. To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

v. To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

vi. To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

vii. To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K. **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant. References to "the government" in this agreement refer only to that Office. This agreement does not bind any other federal, state, or local prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L. **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

RICHARD S. HARTUNIAN
United States Attorney


_____          May 11, 2015
RICHARD BELLISS                            Date
Assistant United States Attorney
Bar Roll No. 515295


_____          may 11, 2015
SCOTT VALENTE                              Date
Defendant


_____          5/11/2015
Joel D. Schwartz                           Date
Attorney for Defendant
Bar Roll No.   pro hac vid


28